UNITED STATES of America, Plaintiff,

v.

**BOARD OF PUBLIC INSTRUCTION OF ST. LUCIE COUNTY, et al., Defendants,**

v.

**Father Richard L. BARRY, et al., Intervenors.**

**No. 70–1017–CIV.**

United States District Court, S.D. Florida.

Sept. 10, 1997.

Nunc Pro Tunc, Aug. 29, 1997.

---

Judith Keith, Civil Rights Div., Dept. of Justice, Educational Opportunities Litigation Section, Washington, DC, for Plaintiff.

Daniel B. Harrell, Fort Pierce, FL, for Defendant.

William N. Hutchinson, Jr., Ft. Lauderdale, FL, for Intervenors.

## FINDING OF FACTS AND CONCLUSIONS OF LAW

ATKINS, Senior District Judge.

THIS MATTER is before the Court following a public hearing at the Fort Pierce Federal Courthouse, Room 106, 300 South 6th Street, Fort Pierce, Florida on August 15, 1997 at 10:30 a.m., to consider whether to grant the *Motion of the Defendant School District ("The District") of St. Lucie County, Florida for Unitary Status* ("Unitary Status Motion"). Pursuant to Fed. Rule of Civil Procedure 52(a), the Court makes the findings of fact and conclusions of law which shall support the judgment, to be issued forthwith.

### I. INTRODUCTION

27 years ago, in September 1970, under the imprimatur of *Brown v. Board of Ed.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), this Court found that Defendant Board of Education for St. Lucie County ("The District") was operating a dual, segregated school system. This finding immediately imposed on the District the affirmative duty to take all necessary steps to remedy the violation by eliminating all vestiges of segregation in its schools. *See Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968). Under guiding Supreme Court principles, the District was ordered to adopt a plan that "promises realistically to work, and promises realistically to work now." *Green*, 391 U.S. at 439, 88 S.Ct. at 1694.

Since 1970, the District and Plaintiff United States, along with the cooperation and aid of the Plaintiff Intervenors, have submitted various plans with the aim of creating a unitary system. To this end, the matter now before the Court is the above motion. In the *Motion*, the District asks the Court to "grant the District's motion for unitary status, relinquish oversight of this matter, and dismiss these proceedings with prejudice ...," and:

(1) to declare that the District has met its burden of showing that it has (a) complied with the desegregation decree for a rea-

sonable period of time, and has (b) eliminated the vestiges of past segregation in the District to the extent practicable, and to release the District from court supervision in this matter. . . .

Unitary Status Motion at 1, 3 (2/20/96).

As above recited, the School District asks the Court to declare it unitary, and thereby to relinquish the continuing jurisdiction and oversight this Court has exercised the previous 27 years.

■ As directed by the most recent teachings of the Supreme Court, the issue before the Court is whether the efforts of the District have, "to the extent practicable," eliminated the vestiges of the past dual and segregated school system. Further, as fully expressed by many members of the public at the hearing held on August 15, 1997, a corollary issue is whether the district "can be trusted" not to return to its segregated past.

To resolve these seminal issues, a vast evidentiary record, including live testimony from various expert and fact witnesses, the reports of various experts, testimony from concerned residents of St. Lucie County, the entire file in this case, as well as a filed *Joint Stipulation* (as joined by all counsel in this cause), and all other evidence adduced for and against the motion have been considered by the Court.

The Court also appointed as an expert witness, Dr. Gordon Foster, former director of the Southeastern Desegregation Assistance Center at Miami, Florida. Dr. Foster filed a Preliminary and Supplementary report, described as "Analysis Assessing the Unitary Compliance of the St. Lucie County School District."

## II. APPROVAL OF THE STIPULATION

˙ As to the *Joint Stipulation*, the Court is presented with a case in which all parties agree the *Motion for Unitary Status* should be granted. In reviewing the *Motion* and *Joint Stipulation*, the Court is mindful of the general principles that govern the acceptance or rejection of "consent orders," in cases like these.

Accordingly, the Court, with the full and active support of the parties, adopted a policy of review pursuant to Fed. R. Civ. Proc. 23(e). Recognizing this action is not class-certified, the Court nevertheless felt it appropriate to hold a hearing so that interested members of the community might come forward and be heard on the subject whether to grant or deny the District's motion.

To this end, a Notice of Fairness Hearing was scheduled for August 15, 1997 at 10:30 a.m. at the Federal Courthouse, Room 106, 300 South 6th Street in Fort Pierce, Florida. Notices were published in the *Florida Courier* and *The Tribune* (both local papers) for five consecutive weeks preceding the hearing. As well, notices of the fairness hearing were posted at various official locations and copies of the *Joint Stipulation* were available for review. The hearing received extensive coverage in the community, and the turnout at the hearing was substantially larger than even the Courthouse could hold.

■ Although the proposed *Joint Stipulation* is not a settlement, *per se*, the Court has examined the document in the same way it would examine any proposed consent decree or settlement in a class action. To determine whether to approve the *Stipulation*, and thereby adopt the stipulated findings of fact and conclusions of law as the Court's own, the Court has considered factors relevant to cases involving class actions:

1. The likelihood Plaintiff or Plaintiff Intervenors would succeed at trial if they opposed the motion;

2. The complexity, expense and likely duration of the litigation, and the stage of proceedings and amount of discovery completed;

3. The judgment of experienced trial counsel who have evaluated the strength of the case; and

4. Any objections raised by the public.

*Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

In examining the *Joint Stipulation*, the Court was careful to determine that it was executed by all parties at "arm's length" and without collusion or other improper motive. The Court finds the *Joint Stipulation* was

not reached as a result of these impermissible motives.

Finally, and perhaps most importantly, the Court has considered whether adoption of the stipulation would be in the public interest. In considering this element, the Court must always be careful of the extent of its jurisdiction in a case such as here as set out by the Supreme Court and Eleventh Circuit. These consideration are set out more fully below in section III.

■ It is a well understood principle that settlements are favored over continued litigation. *See United States v. Miami*, 614 F.2d 1322, 1333 (5th Cir.1980).[1] The key issues in determining whether to approve a settlement (or as here adopting the stipulation) is to ensure that it is neither unconstitutional, unlawful, contrary to public policy or unreasonable. *Id.*

■ A finding of the above brings with it a presumption of validity, meaning that the district court must have a "principled reason" for refusing to approve it. *Miami*, 614 F.2d at 1333. Mere unfairness is not a valid basis for refusing to adopt a consent decree or approve a settlement. Rather, the court must state specific reasons why a proposed consent decree unduly burdens one class or another. *Id.*

■ Where, as here, Plaintiff is a department of the United States government charged with insuring enforcement of federal laws, the court "can safely assume that the interests of all affected have been considered." *Miami*, 614 F.2d at 1332.

In the instant case, the court notes that the Department of Justice has extensive experience in litigating school desegregation cases, and the *Joint Stipulation* was entered into by experienced attorneys fully aware of all issues. In addition, the *Joint Settlement* represents the culmination of years of negotiation and compromise, and the result of exhaustive review of discovery materials by all parties. As a result of the foregoing, the Court can find no reason not to adopt the *Joint Stipulation*, and its contained findings of fact, as the Court's own.

■ As a final issue, the Court finds the notice provided to the community, including newspaper advertisements and postings at official and conspicuous places, of the hearing would, if necessary, constitute effective notice as contemplated under Fed. R. Civ. Proc. 23(c) & (e).

### III. GUIDING LEGAL PRINCIPLES

Although the majority of evidence is overwhelmingly in favor of granting the District's motion, the hearing of August 15, 1997 revealed a level of deep concern within the minority community of St. Lucie County. In particular, although many of the speakers believed the District had come far in correcting racial imbalances within the school system, there exists an abiding concern the Board may regress without Court oversight.

■ With these concerns, the Court must balance the directives of the Supreme Court and Eleventh Circuit in more recent desegregation cases. The Supreme Court has continually cautioned district courts that "federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Board of Ed. of Okla. City v. Dowell*, 498 U.S. 237, 247, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991). Judicial supervision, and the jurisdiction to continue such oversight is only granted to district courts to the extent discriminatory practices or results continue that are a proximately related to the past segregation. In *Freeman v. Pitts*, 503 U.S. 467, 496, 112 S.Ct. 1430, 1448–49, 118 L.Ed.2d 108 (1992), the Supreme Court cautioned district courts that while "the vestiges of segregation that are the concern of the law in a school case may be subtle and intangible," they must "be so real that they have a causal link to the de jure violation being remedied."

As time passes, the ability of district courts to discern what inequities are the direct result of past segregation diminishes. Indeed, it becomes far more likely that as

---

1. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

time goes by, current problems are the result of new factors, unrelated to past practices, and outside the district court's jurisdiction. *See Freeman,* 503 U.S. at 496, 112 S.Ct. at 1448–49 ("as the de jure violation becomes more remote in time and ... demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior de jure system."). Many of the concerns raised by the public at the hearing are most easily explained as effects of factors, that although unfair or possibly even discriminatory, are unrelated to the past segregation or effects emanating therefrom. In making this statement, the Court is again guided by the Supreme Court's caution in *Freeman,* that while:

> [i]n one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools ... It is simply not always the case the demographic forces causing population change bear any real and substantial relation to a de jure violation

■ Finally, the Court's continuing jurisdiction must be limited to those actions directed towards "the end of restoring victims of discriminatory conduct to the position they would have occupied in the absence of that conduct...." *Missouri III v. Kalima Jenkins,* 515 U.S. 70, 89, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63. In so doing, the Court must always keep in mind the ultimate goal of these cases is to restore "state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1445.

■ The Eleventh Circuit has recently joined the growing chorus of authoritative voices urging district courts to seek an end to these cases. In *Lockett et al. v. Board of Ed. of Muscogee County,* 111 F.3d 839, 842 (11th Cir.1997), the court noted, "federal supervision of local school systems [is intended] to be a temporary measure." The court went on to declare, "[s]ince the legal justification for such supervision is a constitutional viola-

tion by local authorities, a district court must divest itself of jurisdiction when the constitutional violation has ceased and when local authorities have operated in compliance with a desegregation decree for a reasonable period of time." *Id.* (citations omitted).

■ After reviewing relevant Supreme Court precedent, the Eleventh Circuit put forward the following analysis for this Court to follow:

> To ensure that local authorities, are not continuing to practice discrimination, a district court's determination of whether local authorities have complied with a desegregation decree involves a careful assessment of the facts. Utilizing sound discretion after such a careful factual assessment, a district court must determine (1) whether the local authorities have eliminated the vestiges of past discrimination to the extent practicable and (2) whether the local authorities have in good faith fully and satisfactorily complies with, and shown a commitment to, the desegregation plan.

*Id.* at 843 (citations omitted).

Thus, past compliance with Court decrees, coupled with current attitudes are factors the Court must take into account in determining whether the District may return to its former ways. Specifically, the Court will examine issues of the District's former recalcitrance in meeting Court imposed requirements of desegregation, with a particular emphasis on the District's current efforts (overwhelmingly voluntary) to exceed the Court's mandate and *voluntarily* improve the District's desegregation efforts.[2]

It is with these principles in mind the Court makes the following findings of fact. In so doing the Court has considered the *Joint Stipulation,* joined by all parties, and hereby approves its contents. As such, the Court adopts the findings of fact and conclusions of law as contained in the *Joint Stipulation,* as reprinted below.

---

**2.** As laid out in further detail in the *Findings of Fact* below, the Court is particularly impressed with the District's voluntary efforts to make any and all improvements in desegregation efforts as directed by Dr. Foster's and Dr. Peterkin's reports. As previously mentioned, these voluntary efforts are clear indications the District will not regress in the foreseeable future.

## IV. STIPULATED CONCLUSIONS OF LAW[3]

1. To achieve a declaration of unitary status and dismissal of the desegregation decree, the Defendants bear the burden of proving that the original constitutional violations have been remedied. *Freeman*, 503 U.S. at 494, 112 S.Ct. at 1447–48; *Lockett*, 111 F.3d at 845 (Barkett, J., dissenting); *see also, Lee v. Etowah County Bd. of Educ.*, 963 F.2d 1416, 1425 (11th Cir.1992) (*citing Flax v. Potts*, 725 F.Supp. 322, 327 (N.D.Tex. 1989). "The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system ... to the extent practicable." *Freeman*, 503 U.S. at 485, 492, 112 S.Ct. at 1442, 1446 (1992); *see also Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968); *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971)). This duty is a "continuing [one] to take whatever action may be necessary to create a 'unitary, non-racial system.'" *Green*, 391 U.S. at 440, 88 S.Ct. at 1695 (citations omitted).

2. In determining the "degree of compliance with a school desegregation decree, a critical beginning point is the degree of racial imbalance in the school district...." *Freeman*, 503 U.S. at 474, 112 S.Ct. at 1437; *Swann*, 402 U.S. at 25, 91 S.Ct. at 1280–81. "The school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman*, 503 U.S. at 494, 112 S.Ct. at 1447.

3. In determining whether a school district has met its burden the district court should examine not only student assignment, but also "'every facet of school operations—faculty, staff, transportation, extracurricular activities and facilities.'" *Dowell*, 498 U.S. at 250, 111 S.Ct. at 638, *citing Green*, 391 U.S. at 435, 88 S.Ct. at 1692–93.

4. In addition, "[m]ore recently, courts have also considered the relative quality of education offered to black and white students." *Freeman*, 503 U.S. at 492, 112 S.Ct. at 1446; *Pitts v. Freeman*, 887 F.2d 1438, 1445 n. 8 (11th Cir.1989), *rev'd on other grounds*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *see also Stell v. Board of Public Ed. for City of Savannah*, 860 F.Supp. 1563, 1578 n. 24 (S.D.Ga.1994). As the Supreme Court stated in *Freeman*, it is appropriate that the Court "inquire whether ... elements [other than the *Green* factors] ought to be identified, and to determine whether minority students [are] being disadvantaged in ways that require[ ] the formulation of new and further remedies to insure full compliance with the court's decrees." *Freeman*, 503 U.S. at 492, 112 S.Ct. at 1446.

5. The Court should also examine the effectiveness of the district's current desegregation plan:

> The measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the *effectiveness*, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system.

*Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979–80, 61 L.Ed.2d 720 (1979) (citations omitted) (emphasis added); *Davis v. School Comm'rs of Mobile Co.*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1291–92, 28 L.Ed.2d 577 (1971).

6. In making its determination as to unitariness, the district court should consider "whether the school district has exhibited a record of full and satisfactory compliance with the [desegregation] decree and ... 'whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the laws and the Constitution that were the predicate for judicial intervention in the first place.'" *Freeman*, 503 U.S. at 491, 112 S.Ct. at 1445–46. "The good faith requirement

---

**3.** For a clearer understanding, the Court recites the conclusions of Law first, to be followed by the Findings of Fact.

assures parents, students, and the public that they will be protected against further injuries or stigma, ... by making 'it unlikely that the school district would return to its former ways.'" *Dowell,* 498 U.S. at 247, 111 S.Ct. at 636–37, and *citing Freeman,* 503 U.S. at 497, 112 S.Ct. at 1449.

7. "[G]ood faith compliance of the district with the court order over a reasonable period of time is a factor to be considered in deciding whether or not jurisdiction could be relinquished. [*Dowell,*] 498 U.S. at 249–250, 111 S.Ct. at 637–38 ('The District Court should address itself to whether the Board has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination have been eliminated to the extent practicable')." *Freeman,* 503 U.S. at 498, 112 S.Ct. at 1449.

8. To demonstrate good faith, the Defendants must show that past commitment is indicative of future reliability. "Mere protestations of an intention to comply with the Constitution in the future will not suffice. Instead, specific policies, decisions, and courses of action that extend into the future must be examined to assess the school system's good faith." *Dowell v. Board of Ed. of Oklahoma City Pub. Sch,,* 8 F.3d 1501, 1512–13 (10th Cir.1993) (*citing Brown v. Board of Educ.,* 978 F.2d 585, 592 (10th Cir.1992)), *cert. denied* 509 U.S. 903, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993).

9. In addition, as the Eleventh Circuit has held, it is "essential ... that the district court not terminate a desegregation case before the Plaintiffs are afforded an opportunity to demonstrate to the court why the case should not be dismissed." *Lee v. Etowah County Bd. of Ed.,* 963 F.2d 1416, 1424 (11th Cir.1992); *Youngblood v. Board of Public Instr. of Bay Co.,* 448 F.2d 770, 771 (5th Cir.1971).

10. Where a school district has complied with its desegregation orders for a reasonable period of time and has eliminated the vestiges of the *de jure* system to the extent practicable and, thus, achieved unitary status, then upon motion of the district, after the Plaintiff parties have had full opportunity to be heard, the Court may dissolve the desegregation decree, terminate its supervision of the school desegregation case, and dismiss the action. Ultimately, "the court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1444–45.

## V. FINDINGS OF FACT

### A. HISTORICAL BACKGROUND

1. This action was brought by the United States in 1970, pursuant to Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, (Title IV), against the Board of Public Instruction of St. Lucie County (the "District"). Father Richard L. Barry and others subsequently joined this action as Plaintiff-intervenors. The United States and the Plaintiff-intervenors alleged unlawful operation of a racially dual system of public education in violation of the Fourteenth Amendment to the Constitution and of Title IV.

2. In 1970, the District was found liable for operating a "dual school system based on race" in violation of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). August 31, 1970, Findings of Fact and Conclusions of Law, ¶ 6 Conclusions of Law. The District was required to disestablish the dual system of schools and to "correct the effects of past [racial] discrimination...." September 4, 1970 Order ¶ 1 at 1–2. The Court held that "[a]n effective desegregation plan should produce integration of faculties, staff, facilities, transportation and school activities along with integration of students." August 31, 1970, Findings of Fact and Conclusions of Law, ¶ 9 Conclusions of Law. (*citing Adams v. Mathews,* 403 F.2d 181 (5th Cir. 1968), and *Green,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.)

3. Pursuant to Order of the Court of July 9, 1970, the U.S. Department of Health, Education and Welfare, Office of Education, and the District were both required to submit plans "for the conversion of the Defendant school district to a unitary, non-discriminatory system." August 31, 1970, Findings of

Fact and Conclusions of Law, ¶ 2 Findings. Upon review of both plans, the Court held that "[t]he desegregation plan submitted by the Office of Education, [U.S.] Department of Health, Education and Welfare meets the requirements of law and will achieve a unitary school system for Saint Lucie County School District." *Id.*, ¶ 13 Conclusions of Law. By Order of September 4, 1970, ¶ 2 at 2, the Court required Defendants to amend their desegregation plan "in accordance with the plan of desegregation prepared by the Office of Education of the Department of Health Education and Welfare." The Court further required that "[g]eographic attendance zones ... be created for all schools as provided for in the ... HEW plan of desegregation." Sept. 4, 1970 Order at 2, 12 c. Pursuant to the requirements of the Court's Order, Defendants created geographic attendance zones for all schools. These geographic attendance zones were modified several times during the 1970's and 1980's to accommodate the District's rapid growth.

4. In December 1986, in response to a District motion to acquire an additional elementary school site and to construct a school, the Biracial Advisory Committee expressed concern with the District's approach to siting and zoning new schools, and recommended that the District consider a long-term plan. Letter, St. Lucie County Biracial Advisory Committee to Dr. George Hill (12/15/86). In January 1987, the United States concurred in this concern of the Biracial Committee, asserting that a "long-term plan would provide a means of evaluating the overall long range impact on desegregation of new schools, rather than the short range view provided by the current piecemeal approach." Response of the United States to Defendants' Petition for Approval of School Site and Construction and to Extend Grade Structure at Lincoln Park Academy at 2 (1/21/87). The Court approved the motion to acquire the school site, and also required the District to prepare and file a five year plan for school site selection, construction and zoning. Order on Petition for Approval of School Site and Construction and to Extend Grade Structure at Lincoln Park Academy, ¶ 1 at 2 (1/30/87).

5. In February 1988, Defendants filed a Plan for School Site Selection, Construction, and Zoning, 1988–1995. The United States raised concerns with the adequacy of this Plan. Response of the U.S. to Defendants' Plan for School Site Selection, Construction, and Zoning, 1988–95, (5/3/88). Thereafter, the District and the United States engaged in discussions to attempt to resolve points of disagreement, but were unable to reach a complete resolution. Defendants' Status Report on Discussions Concerning Plan for School Site Selection, Construction, and Zoning, 1988–95. (6/21/88). On July 12, 1988, the Court ordered the District, *inter alia*, "to file within 45 days a final, complete plan, supplementing that filed March 1, 1988, which meets the requirements of the January 30, 1987 order designating specific school locations and attendance zones for at least the forthcoming *three* years." Order on Pending Petitions, ¶ C at 2–3 (7/12/88) (emphasis in original).

6. On July 27, 1988, Defendants advised the Court that the District was "reviewing other student assignment methodologies in addition to residential attendance zones" and was considering "controlled choice assignment methodolog[ies]." Motion for Partial Reconsideration of Order Dated July 12, 1988, at 5–6 (7/27/88). The parties engaged in negotiations as to a controlled choice plan of student assignment. The District employed Dr. Michael Alves as a consultant on controlled choice, and the United States employed Dr. Charles Willie of Harvard University. The United States made Dr. Willie available to Defendants for consultation on a controlled choice student assignment plan for the District.

7. In June 1989, after consultation with Dr. Willie and with the United States, the District filed its Revised Plan for School Site Selection, Construction, and Zoning, 1988–1995. At the elementary level the District adopted a phased controlled choice student assignment plan, with the operational plan to be submitted later. The Court approved this revised plan "subject to review and consideration of any objections to the 'operational plan' which will implement the revised plan." Order Approving Final Revised Plan for

School Site Selection, Construction, and Zoning, 1988–1995 filed June 2, 1989 (7/12/89).

8. In May 1990, the District filed its Amendment to Plan for School Site Selection, Construction, and Zoning, 1988–1995 (Operational Student Assignment Plan). The United States raised concerns with the Operational Plan, and the parties subsequently engaged in negotiations. The Operational Plan was modified as a result of these negotiations, and the Court approved the amended plan in March 1991.

9. The first full year of operation of controlled choice in the District was in 1991. Joint EX 1 (Mosrie Affidavit) ¶ 4 at 2 (2/13/96). All new elementary students, all previously enrolled elementary students residing outside the choice zone of their 1990–91 school, and all middle school students were assigned under the controlled choice plan. In the Fall of 1992, all new high school students were assigned on the basis of controlled choice. The District currently operates a version of this plan approved on March 6, 1991.

**B. STUDENT ASSIGNMENT**

1. The Court's Order of September 4, 1970, ¶ 1 at 1–2, provides, in pertinent part, that:

> Defendants ... are enjoined from discriminating against black students attending the public schools in Defendant district on the basis of race and are required to take further action, as described herein, to disestablish the dual system of schools based upon race and to correct the effects of past discrimination based upon race.

The Order also requires that the District "bring about the maximum amount of desegregation possible." *Id.*, ¶ 2(c) at 2.

2. District policy requires that "[a]ll students in the District shall be assigned in accordance with the Controlled Choice Student Assignment Plan set forth in [District] Policies 5.80–5.88." Joint EX 113 (District Policy 2.53(1)).

3. The Controlled Choice Student Assignment Plan provides students with choices within three geographically described choice zones, each containing an equitable number of elementary schools, one or more middle schools, and one high school. Joint EX 114 at 002421 (District Policy 5.80(1)). "[E]ach choice zone contains an elementary school in a predominately black area, an elementary school in a predominately white or racially mixed area of Fort Pierce, and other elementary schools outside of the Fort Pierce area...." *Id.* at 002423 (District Policy 5.81(2)). Parents select a school for their child within limits set by space availability and desegregation goals. *Id.* (District Policy 5.80(1)). Parents and students list preferences from among schools located in their choice zone, in rank order, with no guarantee of assignment to a particular school. *Id.* Students are then assigned to a school based on physical space, racial diversity guidelines, transportation availability, parental choice, sibling priority, proximity priority, and lotteries. *Id.* By the terms of the Controlled Choice Plan, African–American enrollment at a particular grade level in a particular school may not deviate more than 10 percentage points from the respective choice zone average; each of the three zones was created with an African–American enrollment within five percentage points of the district-wide grade level average. *Id.* at 002425 (District Policy 5.81(4)).

4. There also are several magnet programs available to students in the District on a first-come first-serve basis, subject to space limitations and desegregation goals, and the Controlled Choice Plan provides for the implementation of special attractor programs for school that are "chronically under-chosen." Joint EX 113 (District Policy 2.53(5)); 114 at 002436–37 (District Policy 5.85). By District policy, for each magnet school, the District is committed to achieve an enrollment within 15 percentage points of the district-wide grade level average of each race. Joint EX 113 (District Policy 2.53(5)(c)).

5. Under District policy, all of the regular elementary schools in the District are to have equivalent educational offerings, and equivalent programs are to be maintained at the secondary schools. Joint EX 114 at 002424 (District Policy 5.81(3)).

6. By District policy, the District has established a Student Assignment Appeals

Council. The Appeals Council membership consists of 6 members: 3 District personnel, and 3 volunteer community members appointed by the School Board. Joint EX 114 at 002433 (District Policy 5.82(9)). The Council's role is to determine whether the student assignment guidelines contained in the Controlled Choice Plan have been followed. *Id.* at 002434 (District Policy 5.82(9)(b) 1.).

7. The District has codified the Controlled Choice Student Assignment Plan, its magnet procedures and its transfers guidelines in official School Board policy. Joint EX's 113 (District Policy 2.53(1), (5)); 114 at 002421–002449 (District Policy 5.80–5.88, 5.90–5.96).

8. Queen S. Townsend has been employed by the District for 32 years. Joint EX 121 at 6. She has held the position of Assistant Superintendent for Curriculum since 1991, and in 1996 she served as interim Superintendent of the District. *Id.* at 5–6. Prior to 1991, she was Director of Elementary Education, and prior to that position she served as an elementary principal. *Id.* at 6–8. Ms. Townsend testified by deposition, and at the hearing of 8/15/97 that she has had extensive involvement with the School Board in her official capacity, and that she serves on the District Policy Committee. *Id.* at 7–8. Thus, she has knowledge of policymaking in the District. *Id.* Ms. Townsend testified that, in her current position and in her position as Interim Superintendent, she was not aware of any steps, actions, or plans by the District, to alter or amend the Unitary School System Policy, (Joint EX 113, District Policy 2.53), or the Controlled Choice Student Assignment Plan (Joint EX 114, District Policy 5.80—5.88), in a manner that would adversely affect desegregation in the District. *Id.* at 16–63. She further testified that if the District, in the future, does seek to alter or amend the Unitary School System Policy or the Controlled Choice Student Assignment Plan, public hearings will be held which will be advertised in public media, and public comment will be taken into consideration by the District. *Id.* at 64.

9. Dr. Foster stated that, as of February 1996,

the District under the direction of its superintendent, Dr. David Mosrie, and a capable staff is carrying out an exemplary 'parental choice' desegregation plan in which no schools are racially identifiable and in which stability of assignment, racial fairness, and improvement in education are the primary notions. The [Southeastern Desegregation Assistance] Center is privileged to use the District as a model of 'how it can be done' and has sponsored numerous individual and group visits from districts all over the southeastern United States to observe the process.

Joint EX 2 ¶ 6 at 3.

10. Dr. Foster examined the racial identifiability of District schools for the period 1985–86 through 1995–96, relying on several different measures and indicators. In making his evaluation, Dr. Foster noted that the relative racial percentages of black and white students in the District at the elementary and secondary levels have remained relatively stable from 1985–86 to date. Preliminary Foster Report at 4; Joint EX's 10–12, 14, 16, 18, 20, 22, 25, 27, and 30.

11. Dr. Foster defined racial identifiability as where a school is "substantially disproportionate in its racial composition to the average of all district schools at the same grade level." Preliminary Foster Report at 3. Using a standard of plus or minus 15 percentage points from the district-wide racial average at each grade level, Dr. Foster found that "there have been no racially identifiable schools ... at the secondary level" from the 1985–86 school year through the 1995–96 school year. *Id.* at 4; Joint EX's 10–12, 14, 16, 18, 20, 22, 25, 27, and 30. The same is true for the 1996–97 school year. Joint EX 31. For elementary schools, Dr. Foster found that:

[i]n 1985–86 of the 12 elementary schools, 5 were racially identifiable as Black schools and 3 as white. In 1986–87 of the 14 elementary schools in operation, 4 were racially identifiable Black and 3 white. The following year the number was reduced to 4 (1 Black and 3 white), in 1991 to 1 school, and to none for the past 4 years with controlled choice.

Preliminary Foster Report at 4; Joint EX's 10–12, 20, 25, 27, 30, 31.

12. Dr. Foster also determined that "[s]ince 1986 there have been no regular schools in [the District] with enrollments greater than 90 per cent of one race" and, in that same period, neither were Black students racially isolated in terms of actual numbers at individual schools. Preliminary Foster Report at 4; Joint EX's 10–12, 14, 16, 18, 20, 22, 25, 27, 30 and 31. Dr. Foster relied, in part, on the Tauber Index of Dissimilarity to measure, quantitatively, desegregation trends. Preliminary Foster Report at 5. He concluded that "[i]ndices for the District illustrate the salutary results of controlled choice assignment over the past 5 years and, again, almost total racial desegregation of the District's schools." *Id.;* Joint EX's 10–12, 14, 16, 18, 20, 22, 25, 27, 30 and 31.

13. Dr. Foster also examined whether students were racially segregated by classrooms within schools. He found that the District "has not done this as evidenced by the data given in the annual reports to the Court for the number of students by grade, classroom, and race in each school. An informal check of these figures from 1990 through 1995 suggests a generally desegregated classroom situation." *Id.*

14. Dr. Foster ultimately concluded that, in terms of racial identifiability, "for some years it is fair to state that [District] schools have been not Black, not white, but 'just schools.'" Preliminary Foster Report at 4.

15. By Order of August 14, 1985, this Court required Defendants to submit to the Court, proposed Board policies on student transfers, and to provide as part of the biannual reports to the Court, a summary of "[a]ll transfer requests by race, the Superintendent's action on all requests, and the reason for denial or acceptance of all requests...." Order on Petition of Defendants ¶ D, E at 5–6 (8/14/85). In January 1986, the District filed its first transfer report and submitted proposed student transfer guidelines. At the request of the Court, Dr. Gordon Foster made a Report and Recommendation on, *inter alia,* the proposed transfer guidelines. Notice of Filing of Report and Request for Response, with attached Report and Recommendation of Dr. Foster (2/24/86). The District modified the transfer guidelines based on Dr. Foster's report. Defendants' Response to Report and Recommendations at unnumbered pp. 3–4 (3/14/86). By Order filed August 13, 1986, this Court adopted the Guidelines for Student Transfers which have continued, with some modifications, to govern student transfers in the District. Amended Order Establishing Guidelines for Student Transfers at 2 (8/13/86). Since 1987, in each October Report to the Court, Defendants have reported ample detailed information on the number and type of transfer requests, whether the requests were granted or denied, and the reasons for grant or denial. Joint EX's 12, 14, 16, 18, 20, 22, 25, 27, 30 and 31.

16. Under limited circumstances and within desegregation goals, students may be granted one-year renewable transfers between schools. In this regard, District policy provides that, as reflected in the Controlled Choice "Student Assignment Plan, certain students will be eligible for transfer (which typically is temporary) from their assigned school, with all such transfers to be in accordance with the guidelines for student transfer set forth in Policies 5.90–5.96." Joint EX 113 (District Policy 2.53(1)).

17. The Court's Order of September 4, 1970, ¶ 2 f at 5, requires that the District permit majority to minority student transfers among schools in the District. District policy provides that students,

with the consent of a parent or guardian, may transfer from a school in which their race is in the majority to attend a school within their choice zone in which their race is in the minority, regardless of the availability of space at the latter school, and the Board will furnish free transportation in accordance with its regular transportation policies. M–M transfers do not apply to District-wide magnet schools.

Joint EX 7 at 002442. Dr. Foster concluded that these "m-to-m" transfers were "never a significant factor in the desegregation of [District] schools," and "[s]ince the 1991–92

school year there have been no majority Black schools, so this transfer provision is no longer operational." Preliminary Foster Report at 6.

18. The desegregation Order of September 4, 1970, ¶ 2h at 5, also requires that interdistrict transfers be done on a non-discriminatory basis, and that such transfers shall not be granted by the District where the cumulative effect would either reduce desegregation in either the sending or the receiving district, or reinforce dual school systems. Dr. Foster determined that "[m]ost of these transfers result from parental hardship, rural isolation, or similar reasons and, while racially skewed, are not of sufficient number" to adversely affect desegregation. Preliminary Foster Report at 7.

19. As to intradistrict transfers, Dr. Foster determined that with the initial implementation of controlled choice, there was an increase of 663(40%) in the numbers of transfers requested in 1991, particularly for white students. *Id.* at 7 and Att. C. "Since that time the District has reworked its transfer policies and tightened up the procedure significantly." *Id.* and Table 3. He ultimately concluded that "there appear to be no racial disparities currently in the transfer process which, in turn, offers no threats to the healthy status of desegregated student assignments." *Id.* at 7.

20. The District is committed to reporting to the public twice each school year detailed information about the results of its student assignment practices, including the "[n]umber of students enrolled in District schools, grouped by choice zone, grade level group, and race." *Id.* (District Policy 2.53(11)).

21. The District also has voluntarily established an external monitoring body, "the Unitary School System Advisory Committee" that "shall review each aspect of the District relative to the maintenance of a unitary school system," including specifically "the Controlled Choice Student Assignment Plan set forth in Policies 5.80–5.88; the guidelines for student transfer set forth in Policies 5.90–5.96; [and] the educational facilities planning, site selection, and acquisition procedures set forth in Policy 2.55." *Id.* (District Policy 2.53(12)).

22. The District also voluntarily monitors demographic projections in order to plan effectively for racially and ethnically diverse school enrollments in the future. *See, e.g.,* Joint Exhibits 77, 78, 79, 83, 84 and 85.

23. Dr. Foster ultimately concluded that in the area of student assignment, the District has complied in good faith with the Court's orders and, through adoption of the controlled choice policies and practices, has "internalized the advantages of long-range planning and desegregated schools to the point that the District is not likely to return to discriminatory practices in the foreseeable future, even with a change in the Superintendent and in the Board." Preliminary Foster Report at 9. Further, the "District has clearly eliminated the vestiges of the dual system of racially identifiable schools in regards to student enrollment." *Id.*

24. After a full review of the evidence, the Court finds the District has met its burden in showing that it has eliminated, to the extent practicable, the vestiges of segregation. Further, the Court finds the District has brought itself into compliance in good faith, and shows no evidence of returning to its former segregationist ways.

### C. ADMINISTRATORS, FACULTY, AND STAFF

1. The Court's Order of September 4, 1970 provides, in pertinent part, that:

[a]ll faculty and staff shall be assigned, so that the ratio of [African–American] to white faculty and staff at each school is, as nearly as is mathematically possible, the same as the ratio of [African–American] to white faculty and staff, for the respective grade levels, in the entire school system. Order ¶ 2.d.1. at 3 (9/4/70); and that,

[administrators, faculty, and staff] shall be hired, assigned, promoted, paid, demoted, dismissed and otherwise treated without regard to race, color or national origin, except to the extent necessary to correct discrimination. Order ¶ 2.d.2. at 3 (9/4/70).

2. The District is committed by School Board policy to hire personnel "without re-

gard to age, sex, race, creed, religion, national origin or marital status." Joint EX 7 at 002245–46 (District Policy 3.05(4)).

The District is committed by School Board policy to:

continue to promote diversity within each facet of District faculty and staff;

[have t]he faculty and staff of each school within the District . . . reflect, to the greatest extent practicable, the District-wide black to white faculty and staff ratios, respectively, for the grade level group of such school; [and to],

continue to implement strategies designed to increase the number of minorities in the pools of applicants for faculty and staff positions, . . . includ[ing] . . . identifying and recruiting at colleges and universities with significant numbers of minority students enrolled in education programs, targeting advertising to reach minority candidates, attending recruitment fairs in urban areas, using culturally diverse recruitment teams, and encouraging minority noneducation professionals and minority high school students to enter the teaching field.

Joint EX 113 (District Policy 2.53(3)(a)-(c)).

3. Dr. Foster concluded that:

[n]ondiscriminatory standards for all faculty personnel practices including recruitment, selection, salaries, promotion, demotion and dismissal as ordered by the Court in 1970 have been incorporated into St. Lucie County Board Policies and are now standard operating procedure for the Human Resources Department. There is no indication in any of the material we have available that these are not being properly observed; and that,

[as to administrators and staff], the District, recognizing that a culturally diverse staff has educational advantages for all students, adopted policy to promote staff diversity.

Preliminary Foster Report at 39, 56.

4. In the area of minority faculty employment, Dr. Foster stated that the "best standard for measuring performance in minority employment is the available labor market." Preliminary Foster Report at 34. Dr. Foster found that for the period 1991–1993, the Dis-

trict "was able to employ the number of elementary teachers predictable for the State of Florida," and that the "District's effort to employ minority secondary teachers was quite successful, clearly outpacing the state and national labor market percentages." *Id.*

5. As to employment of black administrators for the period 1985–86 to 1995–96, Dr. Foster found that "the District appears to be as well-represented as other Florida districts at the elementary and administrative level, and well ahead of them at the secondary level." *Id.* at 57; Joint EX 1 (Mosrie Decl. Att. 12(b) (2/20/96)).

6. In the 1996–97 school year, there were 7 (25.9%) blacks among the 27 District Central Office administrators, and 23 (34.3%) blacks among the 67 school based administrators. Joint EX 31 at 1.

7. Dr. Foster examined Equal Employment Opportunity Commission Reports EEO-5 for school years 1992–93 and 1993–94, (EEO5), (Joint EX 96), and 1990 census data to analyze support staff employment by race. He concluded that this data demonstrated, "generally a successful minority employment effort by the District in noninstructional occupations." Preliminary Foster Report at 56; Joint EX 1 (Mosrie Decl. Att. 11(a), (b) (2/20/96)).

8. Dr. Foster examined the fall annual reports for school years 1985–86 to 1995–96 (Joint EX's 10–12, 14, 16, 18, 20, 25, 27, 30, 31), and EEO5's for 1992–93 through 1994–95, (Joint EX 96) to analyze faculty assignment by race. Dr. Foster found that if a standard of plus or minus 10 percentage points from the District-wide racial average was used, then "[t]he[ ] [District] figures suggest almost total compliance with the . . . 10 percentage points [variance] standard, most deviations dating back to the 1985–86 school year and the few more recent ones certainly minimal." Preliminary Foster Report at 37.

9. Since the 1992–93 school year, faculty assignment at all of the historically black schools (C.A. Moore, and F.K. Sweet, and Garden City elementaries, and Lincoln Park MS–HS) have been within 10 percentage points of the District-wide average at the relevant grade level. Preliminary Foster

Report at 45–55; Joint EX's 22, 25, 27, 30, 31.

10. In the 1996–97 school year, all of the elementary schools have a faculty racial balance within ten percentage points of the District-wide average at that grade level.[4] Joint EX 31 at 4–5. In that same year, all of the secondary schools have a faculty racial balance within ten percentage points of the District-wide average at those grade levels. *Id.*

11. In the 1996–97 school year, the school based clerical and support staff were 199 (38.5%) black, 293 (56.7%) white, and 25 (4.8%) "other," and the central office clerical and support staff were 31 (27.9%) black, 75 (67.6%) white, and 5 (4.5%) "other." Joint EX 31 at 14–15. In that same year, the school based maintenance, custodial, and food service staff were 219 (58.1%) black, 145 (38.5%) white, and 13 (3.4%) "other," and the central office based maintenance and custodial staff were 28 (29.5%) black, 66 (69.5%) white, and 1(1%) "other." *Id.* at 16–19.

12. Dr. Foster concluded that "[t]he assignment of noninstructional workers to . . . schools falls within a reasonable nondiscriminatory range at secondary schools [in 1992–93 and 1994–95]," and at the elementary level there was an under-representation of minorities at Floresta and an over-representation of minorities at two traditionally black schools, C.A. Moore, and Garden City for those two years. Preliminary Foster Report at 57.

13. The District's annual recruitment budget includes an annual amount set aside specifically for minority recruitment. Preliminary Foster Report at 35.

14. The District has had a minority recruitment committee since 1991. Joint EX 122 at 6. This is a standing committee with multiracial membership which assists in minority recruitment efforts. *Id.* at 6–11; Exhibit 2 to Akre dep. at 1–2.

15. A goal of the minority recruitment committee is to "[e]stablish personal contact with college recruiters or Deans of the College of Education and the College of Liberal Arts to serve as a liaison between the college and our district." Joint EX 122, Exhibit 1 to Akre dep. at 005938.

16. In 1992, the minority recruitment committee contacted the Deans of the colleges of education and the Deans of student placement of major predominantly black universities, and invited them to visit the District for three days and become acquainted with the District. Joint EX 122 at 19, 20. The purpose of the visit was for the Deans to "see how committed [the District was] to the success of any teachers that they would send to [the District]." *Id.; see* Exhibit 3 to Akre dep. The recruitment committee has continued to maintain contact with these institutions. *Id.* at 21–21.

17. The recruiters have the authority to offer contracts of employment to potential recruits. Joint EX 122 at 28–29, Exhibit 1 to Akre Dept at 005938.

18. The District has hired instructional personnel as follows:

| Total Instr. New Hires | | Minority Instr. New Hires |
|---|---|---|
| 1991–92 | 109 | 30 (28%) |
| 1992–93 | 180 | 40 (23%) |
| 1993–94 | 200 | 43 (21.5%) |
| 1994–95 | 252 | 55 (21.8%) |

Joint EX 122, Exhibit 1 at 005937, Exhibit 5 at 005936, to Akre Dep.

19. In evaluating the District's minority faculty recruitment measures (*see* Joint EX 113 (District Policy 2.53(3)(a)-(c))), Dr. Foster concluded that the practices used by the District "are essentially ones that are followed by most southern school districts that are concerned about maintaining or increasing their percentages of minority faculty or staff." Preliminary Foster Report at 35.

20. Dr. Foster ultimately concluded that as to faculty and staff assignments, and other facets of management of faculty and staff, that "the District has complied in good faith with the Court's orders and, by doing so, has eliminated any vestiges of discrimination. . . . It should be recommended to achieve unitary status" as to faculty and staff. Joint EX 3 at 39, 58.

---

4. These data, and those on the secondary schools exclude schools which serve a specialized student population such as the Detention Center, and Woodlands Academy (students with disciplinary problems).

21. The District also is committed by policy to reporting the racial composition of each school's faculty and staff twice each year to an external advisory committee, which will be known as the Unitary School System Advisory Committee. Joint Exhibit 113 (District Policy 2.53).

22. The District will report by race the number of District-based Administrators that it employs as well as the number of school-based administrators. *Id.*

23. The District also will report the number of instructional personnel, including teachers, deans, and guidance directors by race and by school. *Id.*

24. The District also will report by race the number of support staff, including clerical and maintenance staff and bus drivers, that it employs.

25. The District's institutional commitment to achieve a unitary staff and faculty, and its good faith compliance with Court mandates, as well as the substantial evidence in support of finding that the District currently employs a racially balanced faculty and staff, compels the Court to grant the District's motion as to faculty and staff.

### D. FACILITIES

1. The Court's Order of September 4, 1970, ¶ 2.g. at 5, provides in pertinent part that, "[a]ll the school construction and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure...."

2. "At the time of the 1970 Court Order the four historic[ally] Black schools—Lincoln Park, F.K. Sweet, C.A. Moore, and Garden City—were substandard facilities." Preliminary Foster Report at 23. All of these schools are located in the northern part of St. Lucie County.

3. In the 1996–97 school year there were 19 regular elementary schools, 5 middle schools, and 3 high schools, with 1 school, Lincoln Park Academy, serving grades 6–12. Joint EX 31.

4. In June 1992, the District superintendent asked Dr. Foster, who was then with the Southeastern Desegregation Assistance Center, "to conduct a study assessing the educational adequacy of each regular school facility in the District." Joint EX 2 ¶ 7 at 3. The Center hired Dr. Dwayne E. Gardner of Planning Advocates, who, according to Dr. Foster, "is one of the leading experts on school facilities in the country," to assist in the assessment study. *Id.* The study was conducted during the 1992–93 school year. Preliminary Foster Report at 23.

5. In June 1994, the report entitled "An evaluation of the adequacy of school facilities and [a]n analysis of the comparability of facilities in respect to their racial makeup historically and their location in areas of St. Lucie County characterized by racially contrasting housing patterns," (Facilities Report) was completed. Joint EX 2, Att. 1.

6. Factors analyzed in the Facilities Report included school site size, enrollment compared to seating capacity, use of relocatable buildings (portables), space available per enrolled student, and the quality of the physical environment. *Id.* at 6. Because none of the regular schools in the District was racially identifiable in terms of enrollment or faculty and staff assignment, other measures were used to determine if there were race based disparities in District facilities. *Id.* at 11. The 4 historically black schools were compared to all other District schools, and all of the schools in the northern part of the county were compared with all schools in the southern county. "In this way it could be determined whether the historic black schools located in African American residential areas or the northern Ft. Pierce schools located in African American or largely integrated residential areas were receiving disparate treatment in respect to their facilities." *Id.* The largest percentage of minority students reside in the northern portion of the County. *Id.* at 13.

7. The following findings were made in the Facilities Report:

 a. In 1989–90, F.K. Sweet, C.A. Moore, and Garden City, the 3 traditionally black elementary schools, were "on the verge of resegregating." Joint EX 2, Att. 1 at 4. Since implementation of controlled choice, the District has done

a "masterful job [of] ... maintaining schools that are not racially identifiable." *Id.* at 4;

b. In terms of adequacy of facilities, where historically black schools were compared with all other schools, with the exception of Lincoln Park Academy and White City elementary, school sites were found to be adequate. The 3 traditionally black elementary schools rated a little above average in comparison to all other schools. Lincoln Park, a traditionally black k–12 school, ranked the lowest of all secondary schools, and the school was "cramped for space and ... awash with relocatable buildings." *Id.* at 8, 12. In terms of capital outlay expenditures the 3 historically black elementary schools rated much higher, on average, than other schools on average. *Id.* at 12;

c. In terms of adequacy of facilities as measured by comparing north county schools to south county schools, there was a significant difference, with 10 north county schools averaging a rating of 576 and 8 south county schools averaging a rating of 665. *Id.* at 13. However, this difference "was largely a function of the dates of construction; five of the eight south county schools [were] built in the current decade, compared to only one of the northern schools." *Id.* From 1988–89 to 1993–94, the average capital outlay expenditures for north county elementary schools exceeded those for south county elementary schools; however, the obverse was true for secondary schools. *Id.* at 13–14;

d. Generally, District schools rated "exceptionally well" in terms of quality of the physical environment. White City elementary had a lower rating; however, extensive renovations had been completed and more were planned. *Id.* at 9–10;

8. The following recommendations and conclusions were made in the Facilities Report:

a. Following the decade of the 1980's during which six new elementary schools were constructed in South County to accommodate expanding population growth, the District concentrated its capital outlay expenditures on bringing the older northern schools to a condition of parity, including the three Historic black elementary schools. Upon completion of these construction and remodeling projects, there would be no facility inequality between the northern and southern sector schools;

b. As many new school sites as possible should be located near the center of the county, near Midway Road; and,

c. The future of Lincoln Park Academy needs to be resolved.

Preliminary Foster Report at 24.

9. In June 1996, Dr. Foster and Dr. Gardner went again to the District to up-date the Facilities Report. *Id.* They found that for several schools, including F.K. Sweet and C.A. Moore elementaries, and Lincoln Park Academy, substantial additional funds for new construction had been budgeted and some of the construction projects were underway, while others were scheduled. *Id.* at 25–26. Dr. Gardner determined, *inter alia,* that: 1) most of the deficiencies in the north county schools had been corrected; 2) with the acquisition of additional site acreage and proposed new construction, many of the limitations at Lincoln Park Academy had been resolved; 3) due to site limitations, White City elementary was restricted in its ability to functionally serve the program; and, 4) that the plan and practice of placing new schools in neutral sites with access to multiple populations was sound. Preliminary Foster Report, 2 Att. E at 1. Dr. Foster found that due to the District's concentration of capital outlay expenditures on northern schools, "[a]ny inequality that may have existed under the District's prior *de jure* segregated system between the northern and southern sectors has largely vanished." Joint EX 2, ¶ 12 at 5. As to Lincoln Park Academy, in February 1996, Dr. Foster determined that "the District is currently continuing to address ... deficiencies and will reach a satisfactory and racially equitable

answer to the long-range future" of the school. *Id.,* ¶ 13 at 5–6.

10. The District is in the midst of a ten-year, bond-financed capital facilities plan to further expand and upgrade its facilities. *Id.* at ¶ 29.

11. In addition, Dr. Foster found that the capacities of school facilities in the District were not used as a segregative tool. Preliminary Foster Report at 27. Instead, the District had taken steps, in terms of school capacities, to enhance desegregation: "[b]y increasing capacity in some of the older schools in the northern sector schools, it is giving them an equal chance to compete [with other schools in the District]." *Id.* Moreover, the District is not using portable buildings "to exacerbate segregated housing or to prevent desegregation." *Id.* "The largest number [of portables] are usually sited where construction is underway (*e.g.,* Dan McCarty MS or White City Elementary). As the ... new schools ... are brought on line and Dan McCarty and Lincoln Park are finished some relief will take place. Portables will continue to be a factor in the District, however, as long as enrollment continues to rise." *Id.*

12. Dr. Foster also concluded that:

When these[ ] planned changes and additions are completed, and 6 new schools [3 elementary, 2 middle, and 1 high school] added mostly by the fall of 1998, any lingering question about disparity between historic Black schools and the rest, or any doubt about older schools in the northern sector compared to schools in the south will be dispersed.

Preliminary Foster Report at 26.

13. The District is committed by School Board policy to maintaining the comparability between older or newer schools and to reviewing regularly the adequacy and equity of its facilities. Joint Exhibit 113 (District Policy 2.53(6)).

14. The District is committed to reporting to the public twice each school year information about the current use of its facilities, including whether it has "sold or abandoned" any existing facilities or plans to undertake any "construction of expansion of facilities."

Joint Exhibit 113 (District Policy 2.53(11)(a) 4).

15. The District also has voluntarily established an external monitoring body whose responsibilities shall include reviewing and providing comments on the District's "educational facilities planning, site selection and acquisition procedures set forth in Policy 2.55; any long range educational facilities plan proposed in accordance with Policy 2.55(2); ... any proposal to acquire a school site, or to construct or abandon a school facility; [and] any periodic facilities audit undertaken." Joint Exhibit 113 (District Policy 2.53(12)(e) 4).

16. The District also has adopted policies to ensure that school sites are selected in such a manner as to promote racially diverse school enrollments and "distribute equitably among all racial groups the burden of any transportation required to maintain desegregation." *Id.* (District Policies 2.53(4)); Joint Exhibit 7 (District Policy 2.55).

17. The District is committed by School Board Policy to select sites for new schools such as to avoid an adverse effect on desegregation at existing schools. Joint EX 113 (District Policy 2.53(4)(c)).

18. Under School Board Policy, maintaining an equitable burden of any transportation required to sustain desegregation among all racial and ethnic groups is a significant factor in selecting sites for new schools. *Id.* (District Policy 2.53(4)(b)).

19. The District is committed by School Board Policy to equitably apportion relocatable buildings among schools that have deficiencies in permanent classroom capacity, and to distribute these portables so as "to maintain an equitable burden among all races and ethnic ties of any transportation required to sustain desegregation...." *Id.* (District Policy 2.53(6)(d)); Joint EX 7 (District Policy 2.55(4)(c) 8).

20. As to school construction and site selection, Dr. Foster ultimately concluded that:

the District has complied in good faith with the Court's orders and, by doing so, has eliminated any trace of the dual structure in the operation and management of facilities. As a result of its exemplary strate-

gies and accomplishments in this area the District is not likely to return to discriminatory practices in the foreseeable future. *Id.* at 28.

21. The Court wholeheartedly concurs with Dr. Foster's conclusions in this area, and adopts them as its own. As a result, the District's motion will be granted as to facilities.

### E. TRANSPORTATION

1. The Court's Order of September 4, 1970, ¶ 2.e. at 4, requires that "[b]us routes and the assignment of students to buses shall be designed to ensure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis."

2. The District terminated the practice of using separate buses traveling over the same routes for black and white students immediately upon becoming subject to the 1970 desegregation Order. Preliminary Foster Report at 14.

3. "In [school] districts like St. Lucie a large amount of transportation is required to get students to schools regardless of whether they are segregated or desegregated...." Preliminary Foster Report at 15.

4. Based on 1993 data, the District estimated average times and distances traveled for students in the northern part of the county as compared with students in the southern part of the county. *Id.* Att. D. In reviewing this data, Dr. Foster concluded that "[n]ot much is to be gleaned from an analysis of these figures except the observation that little, if any, disparity exists racially or among school or [choice] zones." *Id.* at 15–16. Because, under the Controlled Choice student assignment plan, bus routes are based on how parents/student choose schools, the "resultant average times and distances became somewhat fortuitous." *Id.* at 16. Indeed, "the District is finding that more and more parents/students are choosing schools farther from their residence in order to obtain an educational program they want or in order to attend a school they perceive as first-rate." *Id.*

5. Dr. Foster examined transportation patterns to 3 representative elementary schools located in the northern, southern, and central parts of the county "in an attempt to discern variances in transportation patterns." *Id.* He found little variance, and in his opinion, it is unlikely that a review of all routes in the District would yield different results. *Id.* "Most routes run less than 45 minutes on the average with a range of 20 to as high as 80 minutes for geographically isolated students. That latter would be subject to the same transportation times no matter what plan of desegregation was implemented." *Id.*

6. Under School Board Policy, maintaining an equitable burden of any transportation required to sustain desegregation among all racial and ethnic groups is a significant factor in selecting sites for new schools. *Id.* Joint Ex 113 (District Policy 2.53(4)(b)).

7. The District is committed by School Board policy to having the "transportation plan for each grade level group within the District ... distribute equitably among all racial groups the burden of any transportation required to maintain desegregation." Joint EX 113 (District Policy 2.53(2)(a)).

8. The District is committed by School Board policy to periodically examining the transportation system and to designing bus routes and assigning students to busses "in a manner that will ensure the transportation of all eligible students on a desegregated and nondiscriminatory basis." *Id.* (District Policy 2.53(2)(b)).

9. The District is committed by School Board policy to endeavor to limit transportation times to "50 minutes for elementary schools, and 60 minutes for secondary schools, in each direction...." *Id.* (District Policy 2.53(2)(c)).

10. The District is committed to reporting to the public twice each year information about the desegregation of its transportation system. *Id.* (District Policy 2.53(11)(a) 4).

11. The District also has voluntarily established an external monitoring committee to review "each aspect of the operation of the District relative to the maintenance of an unitary school system," including as appro-

priate, transportation. *Id.* (District Policy 2.53(12)(e)).

12. Dr. Foster ultimately concluded that, the District has complied in good faith with the Court's orders, has eliminated the vestiges of a dual structure in the transportation system, and is not likely in the foreseeable future to return to discrimin[atory] practices in operating its buses. "[I]t should be recommended to achieve unitary status" as to transportation.

*Id.* at 17.

13. Although it appears to the Court that continued siting of schools exclusively in the southern portions of the district may eventually create imbalances in transportation burdens that will fall disproportionally on the northern mostly minority community, the District's well documented commitment to equitably distribute transportation burdens, and the current lack of any racially identifiable burdens compels this Court to grant the District's motion as to transportation. As well, the institutional safeguards as implemented by the District, convinces the Court that any future burdens will be adequately handled by local authorities and processes.

## F. EXTRACURRICULAR ACTIVITIES

1. The Court's Order of September 4, 1970, ¶ 2.i. at 5–6, provides that:

The school district shall be prohibited from maintaining any . . . extra-curricular activity on a segregated basis, so that no student is effectively excluded from . . . participating in any non-classroom or extracurricular activity on the basis of race, color or national origin.

2. The District is committed by School Board policy to continue promoting racial and ethnic diversity in both the offering of and participation in authorized extracurricular activities. Joint EX 113 (District Policy 2.53(7)(a)).

3. The District is committed by School Board policy to selecting all faculty advisors, directors, coaches, and leaders for extracurricular activities on a nondiscriminatory basis. *Id.* (District Policy 2.53(7)(c)).

4. The District is committed by School Board policy to endeavor to continue providing students with in-county transportation, (*e.g.*, activity buses) within the limits of available resources, to facilitate participation in extracurricular activities. *Id.* (District Policy 2.53(7)(d)).

5. Queen S. Townsend, whose current responsibilities include assisting schools in establishing after-school programs and providing allocated resources for these programs, testified by deposition that: 1) all of the high schools have activity buses assigned to them; 2) all middle schools have a transportation budget that allows them to secure transportation for students who remain beyond the school day; and 3) elementary schools with extended day programs can make requests through the secondary schools for student pick up or the elementary school will be designated as a drop off point for participating students. Joint EX 121 at 54–55. She also testified that she is not aware of any steps, actions, or plans by the District which would reduce the availability of transportation provided for extracurricular activities. *Id.* at 56–57.

6. Dr. Foster considered the availability of activity buses to be "a very important aspect of providing equitable participation in extracurricular activities." Preliminary Foster Report at 19.

7. Jacob Gallmon, District Director of Secondary Education, has worked for the District since 1964. Joint EX 123 (1/21/97) at 6–7. He has been Director of Secondary Education since 1987, and served as a high school principal from 1980 to January 1987. *Id.* (1/24/97) at 7. He testified by deposition that, since 1984, the District requires that all District sponsored extracurricular activities be approved by the District. *Id.* at 25–26. If a program is approved, the District then fully funds the program. *Id.* He further testified that the District provides to students the equipment and uniforms necessary for participation in certain extracurricular activities such as cheerleading, band, and softball. *Id.* at 19–20.

8. He also testified that, since 1988, intramural extracurricular programs have been offered at the middle schools. *Id.* at 15–16.

These programs are open to all students who wish to participate. *Id.* at 16. The middle schools have an advisor/advisee program, one function of which is to encourage student involvement in activities. *Id.* at 22–23. During the school year all middle school students participate in this program. *Id.*

9. At the high school level, a broad range of interscholastic extracurricular activities is offered. *Id.* at 23. A variety of approaches are used at the high school level to encourage student participation in extracurricular activities. These include student orientation which involves, in part, exposure to many activities, having the chorus, band, or drama program perform at elementary and middle schools, and the use of high school guidance and career centers to counsel students to help them identify areas of interest. *Id.* at 28–29. If it is determined that, over a period of time, a particular extracurricular activity (*e.g.*, cheerleading) is participated in primarily by students of one race, then "the Principal is asked why is that occurring and what needs to happen in order to change that.... [A]s they occur you ask the question as to why, and then you provide the remedy." *Id.* at 29–30.

10. Jane Grinsted, District Executive Director of Elementary Curriculum, and interim Director of Elementary Operations, has been employed by the District for 28 years. Joint EX 126 (1/24/97) at 3–5. She has served for 9 years as the Executive Director of Elementary Curriculum, and since June 1996 as interim Director of Elementary Operations. *Id.* She testified by deposition that the extracurricular activities at the elementary level are limited and, other than at extended day schools such as the Village Green magnet, these activities occur during the school day. *Id.* at 99. No student is denied an opportunity to participate in extracurricular activities due to lack of funds; accommodations are to be made to ensure all students can participate. *Id.* at 100. She further testified that, as to the extracurricular activities during the school day, the elementary schools seek to ensure that student participation in these activities is racially diverse, and will continue to do so. *Id.* at 100–104.

11. Under District policy, all students are eligible for participation in extracurricular activities on a non-discriminatory basis, although certain physical activities may be limited to those students determined to be medically fit, and certain competitive interscholastic athletic activities may be limited to students "who are determined by performance and ability to be the more capable participants." *Id.* (District Policy 2.53.(7)(b)).

12. Dr. Foster found that, as to extracurricular activities at the middle and high schools, there was racial diversity representative of the student population in the participation in and sponsorship of these activities. Supplemental Foster Report at 2.

13. Dr. Foster ultimately concluded that, as to extracurricular activities, "the District has complied in good faith with the Court's orders, has eliminated the vestiges of a dual system regarding extracurricular participation, and is unlikely to return to discriminatory practices in this regard in the foreseeable future." Preliminary Foster Report at 20.

14. The District's good faith compliance with Court orders in this area, and its commitment to continue its past efforts and improve on its deficiencies, compels the Court to grant the District's motion as to extracurricular activities.

## G. QUALITY OF EDUCATION

1. The desegregation Orders in this case do not specifically address quality of education issues, but the September 4, 1970 Order, ¶ 2.i. at 5–6, does provide that "[t]he school district shall be prohibited from maintaining any classroom, non-classroom or extra-curricular activity on a segregated basis, so that no student is effectively excluded from attending any class or participating in any non-classroom or extra-curricular activity on the basis of race, color or national origin."

2. Dr. Foster examined "additional school activities ... to make some attempt to gauge the quality of education being offered to Black and white student populations." Preliminary Foster Report at 69. These activi-

ties included student discipline, exceptional student education assignments (both gifted and special education), student retention, and student achievement.

3. Dr. Foster concluded that although the black student representation in all of these areas reflected racial disparities which:

need to be addressed by the District as a matter of sound educational management it is not clear that any of them can be viewed as vestiges of a past dual structure or that any are intentionally discriminatory in that they are created by District actions that can be predicted foreseeably to lead to racial differences.

Preliminary Foster Report at 74.

4. Dr. Foster recommended that it is,

appropriate for the St. Lucie County School Board to be asked to emerge with a feasible action plan to deal effectively with the racial disparities in discipline and in the assignment of students to the [exceptional student education] gifted program as an adjunct to its Motion for Unitary Status.

Supplemental Foster Report at 29.

5. The District has complied with these specific recommendations voluntarily. Joint EX 113 (District Policy 2.53(8)(f) and (9)(g)).

6. *Discipline*

a. Dr. Foster recommended that the District perform a formal study of the discipline data. Supplemental Foster Report at 6. Dr. Foster suggested that recommendations be drawn from such a study which would give the District needed direction in addressing the discipline issue, and that "staff training on an individual or group basis" would be appropriate to address "anomalies discovered in practices in certain schools or by different school personnel." *Id.* at 7. The District has complied with these recommendations voluntarily. *See* Joint EX 113.

b. The record reflects that:

1) The District has adopted as part of its Policy 2.53, Unitary School System, several provisions addressing equitable discipline. Joint EX 113 (District Policy 2.53(8));

2) The District is committed by School Board policy to maintain racially diverse student discipline placement review committees at each school. *Id.* (District Policy 2.53(8)(b));

3) The District is committed by School Board policy to provide appropriate in-service training to assure consistent, uniform and nondiscriminatory application of the student codes of conduct. *Id.* (District Policy 2.53(8)(c));

4) The District is committed by School Board policy to undertake an in-depth analysis and study of District student discipline procedures and practices to ensure equitable treatment of minority students; to the preparation of a written report detailing the results of the analysis and study and any recommended steps and actions; and, to the implementation of the recommended steps and actions at each school in the District. *Id.* (District Policy 2.53(8)(f));

5) The focus of the discipline process in the District is on imposing discipline on the basis of the type, level, and frequency of offenses, and on the needs of individual students. Joint EX 69–76; 123, 126;

6) District administrators testified by deposition that, in their experience, discipline is not imposed inconsistently on the basis of race. Joint EX 123 (1/21/97) at 32–34, 51, 60; 126 (1/22/97) at 15, 48;

7) Since 1993–94 the District has had written elementary and secondary student Codes of Conduct which define offenses by level and set forth the disciplinary responses to offenses, by level. Joint EX 69–76. District administrators consider the disciplinary infractions and the responses to them to be clearly defined in the Codes of Conduct. Joint EX 123 (1/21/97) at 13; 126 (1/22/97) at 10–11;

8) The Codes of Conduct were formulated by District Central Office staff, the District Policy Review Committee (which has had 3 minority members on an ongoing basis since 1991), administrators, and teachers, with input from law en-

forcement personnel, the chamber of commerce, and community members, including minority community members. Joint EX 123 (1/21/97) at 13–15; 126 (1/22/97) at 4, 8–9, 11. The Codes of Conduct are disseminated to students and to parents. *Id.* at 36–37; 126 at 4, 8–9, 11;

9) The elementary and secondary Codes of Conduct are reviewed annually by District administrators (both central office and school based), and by faculty and staff. Joint EX 123 (1/21/97) at 15, 24, 95; 126 (1/22/97) at 4–5, 17–18; .

10) Based on the level of offense committed by a student, under the Codes of Conduct, parental contact is either discretionary or mandatory when an offense is committed. (Joint EX 75 at 010972, 010974, 010976, 010978; 123 (1/21/97) at 88–89; 71 at 010889, 010891, 010893, 010895; 126 (1/22/97) at 19, 24, 34–35, 42–43);

11) The discipline practices and procedures in the District encompass a variety of strategies and programs to address the needs of students having disciplinary problems, including minority students;

12) These strategies include: a) the Comprehensive Dropout Prevention Plan, 1996–97 [5] (Joint EX 112; 123 (1/21/97) at 105–107); 2) student study teams composed of guidance counselors, administrators, school psychologists, and teachers who review information on students, and formulate plans of action to remedy students' discipline problems (Joint EX 123 at (1/21/97) 70–71, 80; 126 (1/22/97) at 25); 3) conferences with school based administrators (Joint EX 123 (1/21/97) at 76); 4) counseling and direction to students with discipline problems through guidance counselors, consultative specialists, and dropout prevention teachers (at 3 elementary schools), (Joint EX 123 (1/21/97) at 41, 76; 126 (1/22/97) at 58–

60); and, 5) alternative programs and schools to allow secondary students who would otherwise be expelled to continue their education in a separate school setting (Joint EX 99; 123 (1/21/97) at 41, 125–127);

13) For the last three years, school improvement teams at each school in the District have devised school improvement plans. Joint EX 124 at 7, 37–39. Under these plans, schools have identified, sought and received diversity and multicultural education training. *Id.* at 38;

14) The school improvement teams are composed of District administrators, faculty, and staff, and parents and community members. *Id.* at 8;

15) In addition, State legislation mandates training and in-service courses in the areas of English for Speakers of Other Languages and in multiculturalism. *Id.* at 14–15. The training provided by the District in compliance with the state mandate include guidance in instructional strategies and ways of working with multi-cultural students. *Id.* at 15–16; and,

16) Approximately three years ago the District created the position of Diversity Coordinator whose responsibilities include making district personnel aware of the diversity training opportunities available. *Id.* at 18–20.

7. *Exceptional Student Education (Gifted and Special Education)*

a. In the 1991–92 school year the student representation in gifted programs District-wide was 93.34% (575) white, 2.92% (18) black, and 3.7% (25) "Other." Joint EX 111 at unnumbered page 4. Based on a rule change by the Florida State School Board, in the 1992–93 school year the District first implemented its Proposal to Increase Access of Under–Represented Students of Gifted Programs. Joint EX 127 at 002801, 002804. Consistent with the new State rule, the Dis-

---

**5.** At the secondary level, the District has had a Comprehensive Dropout Prevention Plan for at least 8 to 10 years. Joint EX 123 (1/21/97) at 106–107, 112. Annually, the District compiles data and prepares a report for the State of Florida which reflects whether and to what extent the District has met the goals for each objective in the Plan. *Id.* at 113.

trict defined under-represented groups as, *inter alia,* those students "whose racial/ethnic backgrounds are other than white non-Hispanic," and those students "who are from a low socio-economic status family based on federal-guidelines for free and reduced lunch." *Id.* at 002804. The goal of the Proposal was to increase the representation of under-represented student groups to reflect more closely their representation in the total student population. Joint EX 125 at 75.

b. The Proposal provided for additional referral, screening, and evaluation criteria in order to determine eligibility for gifted programs. Joint EX 127 at 002805 D–F; 125 at 111–116. These additional criteria were added with the goal of increasing the representation of under-represented groups, and were selected based on the experience of the District. Joint EX 125 at 113–118. As a result of implementation of the Proposal, in the 1996–97 school year, the student representation in gifted programs District-wide was 86.5% (843) white, 6.8% (66) black, and 6.7.% (65) "Other." Joint EX 50, App. unnumbered p. 9.

c. The District has voluntarily adopted an Exceptional Student Education Action Plan. Joint EX 128. This plan was formulated with the assistance of Defendants' consultant Dr. Robert S. Peterkin, based on the recommendations of Dr. Foster, and with the input of the United States' expert, Dr. William Gordon. Joint EX 50 at 6. The plan focuses on implementation of additional expanded strategies to increase representation of under-represented groups in gifted programs, including measures to affirmatively identify potentially gifted students. Joint EX 128 at 2–5. The plan also includes in-service training and development for District staff. *Id.* at App. A.

d. In the area of special education, Dr. Foster determined that "Blacks were clearly over-represented in the [exceptional student education] program entitled educable mental handicapped." Preliminary Foster Report at 73. He ultimately concluded, that while this over-representation concerned him, in his opinion,

> there is no clear indication that racial discrimination exists in making exceptional student education assignments* * *the process is exorbitantly complicated with federal and state laws, regulations, and financing involved; and parental and staff participation locally.

Supplemental Foster Report at 13.

e. In 1995, the District reviewed the records of every student who had been identified as EMH, and determined that each student met the eligibility criteria. Joint EX 125 at 256–257. In 1996, under the direction of Defendants' consultant, Dr. Robert Peterkin, the District conducted an examination of a random sample of approximately 13%—14% of the records of students who have been identified as EMH, and again determined that all students satisfied the eligibility criteria. Joint EX 125 at 257–259. Under federal and state guidelines, special education students in the District are reevaluated at least once every three years. Joint EX 8 at 002632–33, 002649–50.

f. "[I]n 1995 the School Board sought and obtained the report of an outside consultant regarding factors contributing to the identification of students as EMH, and the District has begun implementing the recommendations of that report." Joint EX 50 at 4; Exhibit 19 at 16–19 to Joint EX 125 (Slaga Deposition).

g. The District is committed by School Board Policy to provide appropriate "in-service" training to assure nondiscrimination in the provision of special programs. Joint Exhibit 113 (District Policy 2.53(9)(c)).

h. The District is committed by School Board policy to undertake periodic reviews of special programs data to assure nondiscrimination in the provision of special programs. *Id.* (District Policy 2.53(9)(d)).

i. The District is committed by School Board policy to provide outreach and information to assure that parents of students of all racial groups are informed and aware of all special programs. *Id.* (District Policy 2.53(9)(e)).

j. The District is committed by School Board policy to review periodically the plans that govern the provision of special programs to reduce any potential disparity in minority

student representation in such programs. *Id.* (District Policy 2.53(9)(f)).

k. The District is committed by School Board policy to devise and implement a plan to increase the enrollment of underrepresented groups in special programs for students who are gifted. *Id.* (District Policy 2.53(9)(g)).[6]

### 8. *Student Retention*

a. Dr. Foster examined student retention rates by race. For 1993–94, he found that "[a]t the elementary level on average only 14 students per school were retained; 57 percent of these were held back in kindergarten and grade one." Supplemental Foster Report at 15. "[T]he policy of the St. Lucie Board is to limit retention to one year at the elementary level." *Id.* "[A]t the secondary level 41 percent of the 1262 students not advancing a grade were Black." *Id.*

b. In Dr. Foster's opinion, "[e]ducational research is not entirely clear on the benefits or disadvantages of retention to a student's educational well-being." *Id.* He therefore concluded that "[i]t is my opinion that, in light of these uncertainties, the uneven retention rate for Black and nonblack students in St. Lucie County is not racially discriminatory and should not be a deterrent to the Board's Motion for Unitary Status." *Id.* at 23.

### 9. *Student Achievement*

a. As to student achievement, Dr. Foster found that "[D]isaggregated test data clearly indicated the existence of a serious racial 'achievement gap' which doesn't seem to be lessening very rapidly." Preliminary Foster Report at 74. While Dr. Foster recommended that this issue be vigorously addressed by the District, he considered this disparity to be "largely an educational and political problem ... [that] should not be a deterrent to the Board's Motion for Unitary Status." Supplemental Foster Report at 23, 29.

b. The District is committed by School Board policy to afford an equal opportunity to achieve educational success without regard to, *inter alia,* race. Joint EX 113 (District Policy 2.53(10)).

c. The District is committed by School Board policy to provide appropriate in-service training to personnel to assure that educational opportunities are afforded to all students in a consistent, uniform, and non-discriminatory manner. *Id.* (District Policy 2.53(10)(b)).

d. The District is committed by School Board policy to review student achievement data periodically in order to assure that all students are afforded an equal opportunity to achieve educational success, and to undertake, as necessary, appropriate additional monitoring or action based on the reviews. *Id.* (District Policy 2.53(10)(c)).

e. The District is committed by School Board policy to review periodically the District's pupil progression plan, course offerings, and student remediation programs, and based on these reviews, to implement appropriate changes for the purpose of reducing any potential disparity in minority student achievement. *Id.* (District Policy 2.53(10)(d)).

f. The District is committed by School Board policy to implement school improvement plans at each school that seek to increase achievement and success by students of all racial groups. Joint Exhibit 108 (District Policy 7.36(4)).

g. The District is committed by School Board policy to prepare and widely circulate detailed reports of information concerning educational opportunity. *Id.* (District Policy 2.53(11)(a)(8)).

10. Although the Court is clearly concerned with the racial disparities noted throughout this area of inquiry, the District's institutional commitment, voluntarily imposed, to rectify these continuing problems weighs in favor of finding good faith compliance with Court orders. This, coupled with the clear showing that most of these problems are causally unrelated to past segregation practices satisfies the Court that the District will continue to show improvement in these areas, and its motion should be granted as to "Quality of Education" concerns.

---

**6.** "Special Programs" encompasses gifted programs and special education programs.

## H. REPORTING

1. The September 4, 1970 Order required Defendants to file with the Court and provide to the parties annual reports containing a variety of information on the operation of the school system, including the *Green* facets of operations. Order ¶ 4.a, 5 at 7–8 (9/4/70). The record reflects that since 1985, Defendants have met this requirement. Joint EX 10–31.

2. In 1985, 1986, and 1987, the District filed annual reports to the Court containing a variety of information on the operation of the school system, including the *Green* facets of operations. *Id.* Joint EX 10–12 From 1988 through 1995, in October and June, the District filed Biannual Reports to the Court containing the same information, and in 1996 Defendants filed the October report to the Court. Joint EX 13–31.

3. The District is committed by School Board policy to continue to prepare and widely circulate semiannual reports containing information similar to that provided in the Biannual Reports to the Court. Joint EX 113 (District policy 2.53(11)). Among others, these reports will be made available to the public and will be provided to the Unitary School System Advisory. Committee. *Id.*

4. Again, the District's voluntary efforts to continue to conform to Court imposed reporting requirements, even in the absence of Court supervision, is another indication of the District's good faith compliance in the past, and future of school governance in St. Lucie County.

## I. MONITORING COMMITTEE

1. The September 4, 1970 desegregation Order provides that "[t]he school district shall establish ... a bi-racial committee.... This bi-racial committee shall be charged with the responsibility for discussing ways and means of achieving racial harmony and understanding among the students, teachers and parents and shall function as an advisory body to the school board." September 4, 1970 Order at 6, ¶ 2.j. The Court record in this case reflects that this requirement has been met by the District, and that the Bira-cial Committee has had an active advisory role in this case. *See, e.g.,* Joint EX 32, 33, 36, 38–41, and 43.

2. The District is committed by School Board policy to appoint a Unitary School System Advisory Committee to monitor the District's adherence to the Unitary School System Policy. Joint EX 113 (District Policy 2.53(12)). There will be 17 members on the committee, and the membership will be multiracial. *Id.* (District Policy 2.53(12)(a)). The membership will include two members of the current Biracial Advisory Committee, not more than three School board employees, and parents of students and other residents of the District. *Id.* "The Committee shall review each aspect of the operation of the District relative to the maintenance of a unitary school system," and shall periodically provide written comments and reports thereon to the School Board. *Id.* (District Policy 2.53(12)(e)) 3, 4. The Board shall respond and/or take appropriate action based on their review of the reports, only after presenting the proposed action to the Committee for consideration and reviewing the resultant written comments. *Id.* (District Policy 2.53(g) 1, 2).

## VI. CONCLUSION

After review of all evidence presented, and with a full understanding of all relevant laws and facts, the Court finds the *Joint Stipulation,* as joined by all parties in this case, is a full and adequate statement of the existing situation in St. Lucie County. As a result, it is,

ORDERED AND ADJUDGED:

(1) The District's *Motion for Unitary Status* is **GRANTED;**

(2) This Court withdraws jurisdiction over this matter, and returns authority over all school district decision-making to the appropriate local and state authorities;

(3) As a result of this Court's withdrawal of supervision, the Bi–Racial Committee is no longer needed, and is hereby **ABOLISHED** with the sincere thanks and admiration of the Court for years of fine service and dedication to community;

(4) This case is *DISMISSED* with prejudice.[7]

---

7. The Court noted the public's concern over the term "with prejudice." By dismissing this case "with prejudice," the Court is merely foreclosing further action based on this case. If, in the future, members of the St. Lucie community believe further legal action is necessary to bring local or state authorities into compliance with Constitutional requirements, they may file another lawsuit, or request intervention by federal authorities as may be appropriate.

However, by granting the dismissal of this case "with prejudice", the Court is *permanently* withdrawing its supervision over the District based on *this* case. No further action will be allowed under this filing.